NATIONAL LOCK COMPANY, Appellant, v. The INDUSTRIAL COMMIS-SION *et al.* (Betty Brock, Appellee).

Second District (Industrial Commission Division)   No. 2—86—1189WC

Opinion filed February 18, 1988.

Michael E. Rusin and Charles R. Marcordes, both of Stevenson, Rusin & Friedman, Ltd., of Chicago, for appellant.

Gregory E. Tuite, of Tuite, Shaw, Gesmer, Finnegan & Tuite, of Rockford, for appellee.

JUSTICE CALVO delivered the opinion of the court:

Pursuant to the Workers' Compensation Act (Ill. Rev. Stat. 1979, ch. 48, par. 138.1 *et seq.*), arbitrator William M. Kelley found that claimant, Betty L. Brock, sustained injuries as a result of four separate incidents that arose out of and during the course of her employment with the National Lock Company. The arbitrator consolidated all of the corresponding claims and found claimant to be temporarily totally disabled for 1¹⁄₇ weeks as a result of the August 2, 1979, incident, temporarily totally disabled for 78 weeks as a result of the September 2, 1981, incident, and 22% permanently disabled. (Ill. Rev. Stat. 1979, ch. 48, pars. 138.8(b), (d)(2).) The Industrial Commission (Commission) affirmed the arbitrator's decision, and, likewise, the trial court confirmed the decision of the Industrial Commission. National Lock Company appeals to this court. The two issues presented in this case are: (1) whether the Commission's decision affirming the arbitrator's finding of a causal connection between the incidents and claimant's subsequent ill health is against the manifest weight of the evidence; and (2) whether the Commission's decision affirming the arbitrator's award to claimant of temporary total disability benefits after September 1, 1982, is against the manifest weight of the evidence.

Claimant testified that she did not have back problems before August 2, 1979, the date of the first incident. On that date, claimant worked as a headder for National Lock Company. This job required her to use a prybar to lift and push a wire drawer, which is a box-shaped machine weighing between 400 and 600 pounds. During this activity, claimant felt pain in her lower back and reported it to the shop nurse, Kay VanEtyn, the next day. The nurse gave her heat treatments and put her on light duty. Dr. Schnell subsequently examined claimant on August 3, 1979, X-rayed her lower back and gave

her diathermy and medication. Claimant remained off work from August 3 through August 13 at Schnell's request. The arbitrator awarded claimant temporary total disability for this period of time. Schnell continued to see her on August 6, August 9, and August 21. On August 21, claimant told Schnell that the pain had moved into her left hip and leg, and consequently Schnell gave her a shot of cortisone in her left hip. Schnell released claimant from treatment on August 23, 1979. Claimant also testified that she required hospitalization on August 22, 1979, for chest pains and returned to work in September 1979 with no subsequent restrictions on her physical activity. Claimant received one further heat treatment from the nurse on January 17, 1980, after she again complained of back pain.

The second incident occurred on March 4, 1981. Claimant, while still a headder, felt pain in her lower back after using a prybar to move a wire drawer as she had done during the first incident. Claimant testified that she reported the incident to the nurse and John Peoples, the foreman, either the following day or on March 9, 1981. In any event, the nurse put her on light duty from the time claimant reported the incident until March 12, 1981. On March 12, Dr. Norm Hagman examined claimant, took X rays, recommended Williams exercises for therapy, and recommended light duty. Between March 12 and August 17, 1981, claimant continued to feel pain in her lower back. She periodically reported this pain to the nurse, who would put her on light duty for about a week at a time.

The third incident occurred on August 17, 1981, while claimant was working as a nut tapper operator. This job required her to scoop parts out of pans and put them into hoppers. Claimant felt pain in her lower back after she lifted some full pans of nuts off a skid and onto the floor. The pans are about 2½ feet long and weigh about 60 pounds when they are a little over half full. Claimant testified that she reported the incident to the nurse that same day or the morning of the following day. The nurse put her on light duty for two to three weeks and gave her hydrocollator treatments from August 18 to August 26. Claimant also testified that she told the nurse that she felt pain in her left sciatic area. On or about August 25, claimant saw Dr. Soppa, a naprapath, who examined her and massaged her lower back and left leg. Claimant testified that in August the pain in her lower back and left leg increased.

The fourth incident occurred on September 2, 1981. Claimant, still working as a nut tapper operator, bent down to scoop some nuts off a pan on the floor and felt pain in her lower back as she straightened up to put the nuts in a hopper. Claimant reported the incident to the

nurse on the same day and received heat treatments. The nurse then sent her home. Claimant, on the same day, sought the services of a chiropractor, Dr. Fink, who examined and X-rayed claimant, administered therapy and put claimant on light duty. Fink treated claimant throughout September 1981. Fink's records reveal that claimant first visited him on September 2. In addition, claimant filled out an insurance form on September 4 that indicated September 2, 1981, as the date of the incident.

On September 28, claimant told the nurse she had heard a popping noise in her back while in a shopping mall a few days earlier. At the mall, claimant sat down in a restaurant, twisted to the right and bent over to look under the table when she heard, but did not feel, a pop in her back. Claimant testified that she had heard the pop before that specific incident and had heard it several times afterwards. She testified further that she did not immediately feel any pain after she heard the pop. She experienced some pain, however, a couple of days later, and this pain radiated into her left leg. At the time she heard the popping noise, Fink was still treating her and she had been on light duty at work that day. Fink advised claimant to cease work on September 28.

Sometime between September 28 and October 1, 1981, claimant made an appointment with Dr. Forrest Riordan, an orthopedic surgeon, for October 8, 1981. On October 1, 1981, claimant testified that while sitting on a couch she sneezed and immediately felt pain in her lower back. She lay down on the floor for about one hour until the pain subsided. When claimant saw Riordan on October 8, she told him of the sneezing episode, but she was unsure of whether she told him about her back popping. Riordan took X rays, put her on medication and exercises, and advised her to continue to stay off work. Claimant saw Riordan three times in October, and on October 20 he recommended hospitalization. She was admitted into St. Anthony Hospital on November 1, was given an EMG test and physical therapy, was X-rayed, and was released on November 7. Riordan's medical records indicate that the X rays revealed a slight narrowing of the L5-S1 disc space and some facet arthritis in the same area. In addition, an EMG and a neurological examination were positive for a left S1 lesion. Riordan continued to treat her in November and December and eventually recommended surgery. A myelogram, performed on January 4, 1982, revealed a left S1 lesion. The following day Riordan performed a laminectomy for a herniated disc of the L5-S1 level on the left.

Riordan discharged claimant from the hospital on January 8, 1982, continued to treat her, and released her to return to work with

restrictions on July 27, 1982. The restrictions provided that she could not lift over 15 pounds or perform tasks requiring continuous bending. Claimant received a written note containing these restrictions and submitted it to her employer. The employer offered claimant a job as a nut tapper operator on September 2, 1982. Claimant testified, however, that the job required her to bend 20 to 30 times per hour and lift six-pound scoops. On the first day she returned to work claimant noticed pain in her lower back and reported it to the foreman, who sent her home. The personnel manager, Darryl Stellingwerf, called her the next day and offered her a job as an inspector. The record reveals that the duties of an inspector were within claimant's physical restrictions. She performed this job for three or four days until her layoff on September 12, 1982.

Ron Moore, manager of industrial relations, testified that the employer had laid off roughly 500 of its 700 to 775 employees by December 1982. Those employees were laid off both prior to and after claimant was laid off. Moore also testified that one other person in the department with less seniority than claimant was not laid off until October 12, 1982. Claimant, however, neither requested the job nor filed a grievance as allowed under the union contract. Claimant testified that she could have bumped into a head slotter job, in which she had 1 to 1½ years past experience, but the physical requirements of the job exceeded the doctor's prescribed limitations.

Claimant received unemployment from the date of her layoff until August 15, 1983, when she began to work for her present employer, Specialty Screw. In the interim, on April 16, 1983, the union at National Lock Company went on strike. On April 18, 1983, the employer offered claimant a job, but claimant, a union member, refused to cross the picket line. Claimant testified that she had been laid off for various periods of time in 1979, 1980, and 1981. Moore testified that some of the company's operations moved out of State to places that have no union shops; thus, the employer did not need to follow any seniority priority levels for hiring in those areas. The employer did not offer claimant a job in any of these out-of-State plants.

Claimant continued to be treated by Riordan, and he released her on April 21, 1983. Dr. Gerald McDonald subsequently examined claimant on May 15, 1983, at her counsel's request, and Dr. Sherman examined her at the request of the employer's counsel. The parties stipulated at trial that McDonald would testify that there might or could be a causal connection between all four incidents and claimant's ill health and that claimant's condition was permanent. Finally, claimant testified that she still experienced lower back pain when she washed

dishes, vacuumed, mowed the lawn, and made beds.

■ Respondent first argues on appeal that the incident at the mall where claimant's back popped or the sneezing incident broke the causal connection between the September 2, 1981, work-related incident and claimant's subsequent ill health. The employer points out in its brief that claimant did not begin to exhibit severe symptoms and pain until the bending incident, a few days prior to September 28, and the sneezing episode on October 1. In addition, at that same time, Fink ordered her not to return to work, and sometime between the bending and sneezing incidents claimant made an appointment to see Riordan. The employer notes that after each of the three prior incidents claimant returned to work, except for the eight days of work she lost after the first incident. The employer also suggests that because none of the prior doctors performed any diagnostic tests, none of the doctors perceived or anticipated any problems related to a herniated disc based on claimant's symptoms.

We hold the Commission's decision was not against the manifest weight of the evidence. The parties stipulated that McDonald would testify to a causal connection between the four incidents and claimant's present ill health. The employer argues that the court cannot rely on McDonald's opinion because claimant hired him in anticipation of litigation and there is no indication in the record that he was apprised of the two nonwork-related accidents. The employer, however, did not present any direct evidence to rebut McDonald's opinion. Moreover, the two nonwork-related incidents were inconsequential. Claimant testified that she had heard the popping in her back both before and after the episode in the mall and that she felt no immediate pain after she heard the popping noise. In addition, Hagman's records reveal that claimant told him as early as March 12, 1981, that sneezing accentuated her back pain. Finally, by the time these two incidents occurred, claimant was already on light duty and under Fink's care.

> "Whether an injury arises out of and in the course of employment is a question of fact to be determined by the Industrial Commission, which is to make reasonable inferences and draw conclusions from the evidence. [Citation.] On review, a court will not reject permissible inferences drawn by the Commission because different inferences might also have been reasonably drawn, nor will it substitute its judgment for that of the Commission unless the findings are contrary to the manifest weight of the evidence." (*Illinois Valley Irrigation, Inc. v. Industrial Comm'n* (1977), 66 Ill. 2d 234, 239, 362 N.E.2d 339, 342.)

The Commission and the trial court concurred in the arbitrator's finding that "[t]he bending episode, like the sneezing episode, were merely exacerbations of [p]etitioner's pre-existing work-related back problems." We agree and therefore hold that the Commission's finding of a causal connection between claimant's work-related accidents and her subsequent ill health was not against the manifest weight of the evidence.

■ The employer also contends that even if a causal connection between claimant's ill health and the work-related incidents exists, claimant is not entitled to temporary total disability benefits following her layoff on September 12, 1982, because the economic conditions that precipitated a layoff in the company, rather than claimant's physical condition, caused claimant's lost time after that date. Riordan released claimant for work on July 27, 1982, with bending and lifting restrictions. The employer, however, did not take her back until September 2, 1982, and the job offered to her violated the restrictions. When claimant complained that the work resulted in back pain, the employer offered her a job with light duty that same day. The employer laid off claimant after she worked three days. The arbitrator noted that claimant "could have bumped into another job [at the time of her layoff] but her restrictions precluded it." Consequently, the arbitrator found that "[b]ased on the severity of [p]etitioner's restrictions *** her lost time was due to her physical condition rather than the economic conditions that prevailed."

"[I]f the claimant's disability is limited *** so that he is not obviously unemployable, or if there is no medical evidence to support a claim of total disability, the burden is upon the claimant to establish the unavailability of employment to a person in his circumstances." (*Valley Mould & Iron Co. v. Industrial Comm'n* (1981), 84 Ill. 2d 538, 546-47, 419 N.E.2d 1159, 1163; see *A.M.T.C. of Illinois, Inc. v. Industrial Comm'n* (1979), 77 Ill. 2d 482, 490, 397 N.E.2d 804, 807.) The employer argues that claimant has not met her burden of proof because she has not presented any evidence that she cannot obtain employment within her restrictions and, in fact, she was working at the time of her layoff.

The court in *Ford Motor Co. v. Industrial Comm'n* (1984), 126 Ill. App. 3d 739, 467 N.E.2d 1018, however, held that "[n]either the ability to do light work nor the nonreceipt of medical treatment *** preclude a finding of temporary total disability." (*Ford*, 126 Ill. App. 3d at 743, 467 N.E.2d at 1021; see *Zenith Co. v. Industrial Comm'n* (1982), 91 Ill. 2d 278, 287, 437 N.E.2d 628, 633.) The Commission in *Ford* awarded claimant temporary total disability benefits for the per-

iod of his layoff. The appellate court subsequently affirmed the circuit court's decision confirming the Commission's award. In *Ford*, claimant twisted and sprained his ankle during the course of his employment. The employer gave claimant light work and then laid him off. The court stated:

> "The Industrial Commission could properly find from the evidence that even if there had been no layoff, the claimant was able to do only light work during the layoff period. At the time he left the plant on layoff he was under instruction by the company doctor to 'stay off' his ankle. When the period ended he was unable to perform his regular job because of pain in his ankle; and was, in fact, taken off that work and placed on light work." (*Ford*, 126 Ill. App. 3d at 743, 467 N.E.2d at 1021.)

Likewise, in the case at bar claimant could only perform light duty work both prior to and after the layoff.

In *Zenith* the supreme court also upheld an award of temporary total disability benefits to an employee who was placed on light duty and thereafter laid off. The claimant in *Zenith* sustained back injuries at work, and his doctor allowed him to return to work provided he undertake only light duties. Claimant requested light duty, but the employer advised him that light work was unavailable. The employer later laid off claimant. (*Zenith*, 91 Ill. 2d at 282, 437 N.E.2d at 630.) The court upheld the Commission's award of temporary total disability benefits through the period of claimant's layoff. *Zenith*, 91 Ill. 2d at 280, 284, 288, 437 N.E.2d at 629, 631, 633.

We find the *Ford* and *Zenith* decisions to be controlling in the case at bar. The employer laid off claimant on September 12, 1982. The arbitrator awarded her benefits from September 12, 1982, until April 16, 1983, when the employer offered her a job within her restrictions, but she refused to accept it because of the strike. Without the restrictions, claimant testified that she could have bumped into another job instead of getting laid off. Thus, we hold that the Commission's decision that the severity of the restrictions, rather than the employer's economic conditions, caused claimant the lost time was not against the manifest weight of the evidence.

Accordingly, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

BARRY, P.J., and McCULLOUGH, McNAMARA, and WOODWARD, JJ., concur.